Case 15-3854, Brian Bash v. Textron Financial Corporation. Oral argument, 15 minutes per side. Mr. Warren for the appellant. Good morning, Your Honors. Daniel Warren for the Trustee for Fair Finance, and I'd like to reserve four minutes for rebuttal. Your Honors, Textron figured out in 2003 that it was financing a company whose owners were using investors' funds as what Textron called a piggy bank. At that point, Textron had a choice to make. The loan agreement it was operating under was to come due in January 2004, and Textron's lending partner, United Bank, had already made the decision to exit the relationship. They were paid off, and they left. But not Textron. Textron instead entered into a new loan agreement with the fraudsters with a new promissory note and a new lien, and in fact a bigger lending commitment than Textron had under the original agreement to make up partly for the exit of United Bank. Over the next three and a half years, Textron proceeded to infuse millions and millions of dollars into Tim Durham's and Jim Cochran's Ponzi scheme. And at the end of the day, over 5,000 Ohio families lost their entire investments in the company to a total amount of over $200 million. What is Textron's answer to all this? They don't deny their bad faith for the purposes of this appeal. Instead, they say no matter how bad our conduct was, no matter how bad our faith was, we are protected absolutely by a lien that we got under the first loan agreement in 2002, and the district court did find as a matter of law that that 2002 lien remained valid. That decision was error for three separate reasons, and the first one I'd like to focus on is really just a simple reading of the contract, the 2004 loan agreement, because if we're trying to determine what the effect of that agreement was on the prior lien, we have to, in the first instance, look to what the parties said in their contract. First, the contract created a new lien expressly in paragraph 11A, and throughout the rest of the agreement there are repeated references to the lien created hereby. Hereby means by this agreement, by this document. Is there any argument that it was part of the 2002 agreement, that that was just continuing? The argument I think that Textron makes in that regard is that there is a provision in the 2002 agreement, the prior loan agreement, which states that the lien created in that agreement could remain in effect to cover new indebtedness. We acknowledge that, Your Honor, but that agreement was superseded. In fact, in paragraph 39 of the 2004 agreement, the operative loan agreement, there is an express superseding provision. Actually, Textron doesn't even acknowledge the existence of that provision. In addition to that, Your Honor, there is none of the language in the 2004 agreement that is found in the other cases on which Textron relies on this issue. For example, in In re Tusa, which the District Court also referred to, the court in that case expressly relied on the repeated references in the contract at issue there to the fact that the parties intended the old lien to carry forward and to remain in full force in effect and for the old obligations to remain in full force in effect. That language is nowhere to be found in our agreement, the 2004 loan agreement. There is also another provision in our agreement, paragraph 12a, which sets forth all of the operative liens. It says, except for the lien created hereby, i.e., the lien created in the 2004 agreement, and except for the itemized liens on the schedule, we don't have any liens in effect here. And, of course, the 2002 lien was not itemized on the schedule. Now, if Textron had an intent to keep that old lien in effect, one would expect that they would include it on this list of existing liens, and they did not. What if they didn't need to? Well, I think they did need to, Your Honor, because this is a new agreement creating a new lien, and the new agreement expressly supersedes the old one. So if I'm in their shoes and I want to protect my old lien and make sure that the world understands and that the debtor understands that it's in effect, I'm not going to leave it off of paragraph 12a. Assuming that you're right, is there a statute of limitations problem for you that would bar this claim anyway? There's no statute of limitations bar here, Your Honor, for a couple different reasons. The UFTA, the Uniform Fraudulent Transfer Act, provides for a four-year statute from the date of the transfer of the obligation or, if later, a one-year period from the date that the transfer or obligation could have been discovered. Every court, save just one or two across the country who has examined that language in various other states' UFTA provisions, has concluded that that obviously means that the plaintiff has a one year from the date of discovery of the fraudulent nature of the transfer. And to hold otherwise would, of course, defeat the entire purpose of the UFTA because it would reward parties who, like Textron, actually participated in helping the debtor to conceal the fraud. And, in fact, that happened in two instances here that we documented in the complaint. On January 5, 2004, just one day, actually, before they closed the 2004 loan agreement, Textron's lawyers had expressed the opinion that the disclosures, excuse me, Fair Finance's lawyers had expressed the opinion that the disclosures that Fair Finance was making to the investors were inadequate, the disclosures relating to the improper insider loans by which this fraud was being carried out. And Textron stepped in and agreed with Tim Durham to delay making those required additional disclosures to the investors. Why? Because in Textron's own words, we don't want to send an unsettling message to the market. Later, when Fair Finance's accountants recommended that Fair Finance comply with the anti-fraud accounting provisions of FIN 46, which require consolidation of related companies' balance sheets, and Tim Durham obviously was not willing to do that, Textron again stepped in and said, we agree that Fair Finance should not have to comply with those provisions. And why? Because in Textron's words, and I'm quoting, we're unsure as to the prospects for repayment to our borrower. In other words, Textron understood that these improper insider loans were not being repaid, were not going to be repaid. And Textron went on to say that if we require them to comply with FIN 46, that could adversely affect our borrower's ability to continue to issue the V-notes, the fraudulent investments, which in turn jeopardizes our borrower's capitalization. So here we see, in two different instances, Textron intervening to help Durham and Cochrane, to help the fraudsters perpetuate their fraud scheme, to keep it secret, and to then allow them to escape based on, I think, a tortured reading of the statute of limitations, which would not be a discovery rule at all if it was just one year from the date of the transfer. Is this a matter of Ohio law in terms of the discovery rule for this purpose? It's a matter of Ohio statutory law, yes. It's a UFTA, although it's found in... But then the interpretation of what the discovery rule means is we would look to Ohio... Look to Ohio law or to... Or other... Requies of authority from other jurisdictions... Because there's no Ohio Supreme Court determination... There isn't. I don't believe there's any Ohio court at all. There is a bankruptcy court in Ohio, but that's it. The other reason, Your Honor, why the statute of limitations is not a bar here is under the 10-year look-back rule for the IRS unsecured claim, which the trustee is also able to step into the IRS's shoes to assert that claim. And this is recognized by Section 544 of the Bankruptcy Code, as well as by virtually every case across the country who has interpreted this type of situation. And that, Your Honor, would be a matter of federal law. And all but one case, which we cited to the court, Textron did not, has found that the 10-year look-back does apply to an IRS claim, and the IRS did assert an unsecured claim here. Now, Textron will be quick to point out it was a small claim by the IRS, but the case... How small? I think they say it's $250. $250? But this is an instance where size just doesn't make a difference. And every court, ever since Oliver Wendell Holmes decided Moore v. Bay, it's been understood that even a large discrepancy between the IRS claim and the trustee's claim doesn't matter. There's nothing in the statute that requires a certain proportionality, and there's nothing in the case law that does either. In the case of Ebner, a Northern District of Illinois case that we cited, the court expressly said even a nominal claim by the IRS is sufficient to support the IRS. So what's your best case or cases on the accrual rule that you would have us apply under the discovery doctrine? I'm sorry, are you referring to the discovery rule? Yes. Okay. There are about eight or nine cases that we cited, Your Honor. What's your best? I would say the best is the Smith case out of Hawaii, and there's another case out of the Eastern District of Pennsylvania, a name which is escaping me at the moment. But both of those go into some detail as to the rationale as to why you would have to, both to support the purposes of the UFTA and to read the statute correctly because we have to keep in mind that in the very same sentence, in the prior wording of that very same sentence, there is a reference to the fraudulent nature of the transfer and the fraudulent nature of the obligation. And as the court in Schmidt, I believe, said, the subsequent reference to transfer and obligation is obvious, a reference back to those fraudulent transfers and obligations. Could you address the civil conspiracy claim and why you met your pleading burden on that? Yes, Your Honor. The defense that is offered there is imperi delicto, which, as the court knows, means that the plaintiff is at equal fault for the wrongs that he's asserting. And since, as a matter of common law, Mr. Bash, the trustee, is standing in the shoes of the debtor, the imperi delicto is held to apply, the imperi delicto doctrine. However, there is an exception to the imperi delicto doctrine for an adverse interest where the wrongdoers are acting contrary to the interests of the company. Obviously, the case here where Durham and Cochran were stealing the company's money, the investor's money that they had placed with the company, was being stolen by these fraudsters for their own purposes. So they were obviously working against the interests of fair finance. However, there is an exception to that exception for the sole actor doctrine. And then there is an exception to that exception to the exception, which is the innocent insider doctrine. So I don't believe that it would be appropriate to require the trustee, as an initial pleading burden, to deal with the exception to the exception to the imperi delicto doctrine. And this was decided on a 12B6? Correct. So the district court decided as a matter of law that the innocent insider exception didn't apply. And this is a—I mean, you have to step back and think for a moment as to how complex and fact-intensive that inquiry has to be. Now, we did identify numerous people who worked at the company who were not implicated in the fraud, including the controller of the company, Doug DeRose. And to determine, as a pleading matter, whether that individual was, quote-unquote, innocent or not of this complex Ponzi scheme is not something that should be foreclosed at the pleading stage. It's something that should be—we should have the opportunity to take some discovery on, including, for example, Mr. DeRose's deposition. And I've taken you beyond your time. A lot of your red light's been on, so thank you very much. Thank you. May it please the Court. Mitchell Carlin for TFC. The amended complaint against TFC is based on a fundamental and admitted error of fact. The amended complaint against TFC expressly alleges that TFC did not have a security interest against the assets of the debtor in 2002, and indeed goes on to allege that one of the reasons for the 2004 agreement was to make sure that TFC did, for the first time, get a security interest against the assets of the debtor. You can find those allegations in the amended complaint in paragraphs 177 through 180 and 186. This error was promptly pointed out to the trustees' counsel in the bankruptcy court, and they have acknowledged that error and not pursued that position since. They did not, however, amend the complaint to remove those allegations. What they did instead was come up with a series of legal arguments which are not found anywhere in the complaint. This whole notion that the 2004 agreement constitutes a novation of the 2002 agreement is not anywhere in the complaint. It appears for the first time in the briefing below. Now, why is this important? In fraudulent conveyance law, the threshold element of the claim is the transfer of an asset. Before you get to any questions about reasonably equivalent value, intent to hinder fraud or delay creditors, good faith or bad faith, before you get to any of those questions, the threshold element is, was there a transfer of an asset? In this case, what Judge Gaughan correctly found on the undisputed record is that there's only one transfer of an asset in this case, and that is when in 2002 the debtor gives a security interest to TFC. That's the transfer of the asset. The complaint does not contain any allegation to suggest that there was anything wrong with that transfer. The complaint alleges that at that time the debtor is a robust company earning lots of money and is in excellent financial condition. There's no suggestion that there was a Ponzi scheme underway. There's no suggestion that TFC had any inappropriate knowledge or that there was any knowledge to be had. So it's undisputed both in the complaint, in the bankruptcy court, in the district court and here that the grant of the lien in 2002 is perfectly fine and there's no attack on it whatever. So the case then for the trustee turns entirely on the question of whether at some point after 2002 that lien evaporated and Judge Gaughan concluded based on what she found to be the undisputed language, the unambiguous language, excuse me, of the 2002 agreement and the 2004 agreement, that it did not. It would be possible for the 2004 agreement to wipe out the 2002 lien, right, and the 2002 agreement. It would be possible for that to happen. Judge Moore, if what you're asking me is can two commercial parties who are in an ongoing relationship decide to cancel one lien and create a new one, of course that is possible. Right. So then the question is why doesn't the 2004 do that, which is what I thought your opponent was arguing. Okay. So first, I think you've got to look both at the 2002 agreement, the 2004 agreement, the 2002 UCC-1 and the 2006 UCC-1 and if I can steal from Sherlock Holmes, not Oliver Wendell Holmes, there's the dog that didn't bark in the night. There's the fact that there is no 2004 UCC-1. Let me just start there. If, in fact, the 2004 agreement were intended to wipe out the 2002 loan, lien, it would have been necessary for TFC, in order to perfect what the plaintiff is saying is a new lien in 2004, to promptly file a UCC-1 in 2004. It did not do so. Strong evidence that the parties did not believe that this was a new lien. Second of all, the 2002 agreement expressly provides that the lien granted under that agreement is to The UCC-1, how does that come into the record? I'm sorry, say it again, Judge. The argument you just made about the UCC-1, how does that come into the record? The UCC-1, both the 2002 UCC-1 and the 2006 UCC-1 were exhibits to my motion to dismiss, Judge. Well, are you permitted to present additional evidence in connection with the motion to dismiss? To the extent that it's referred to and relied upon in the complaint, we are. There's never been an argument. So there's no issue in your mind about the propriety of considering that? There's no issue in my mind and respect. Apparently not in the plaintiff's either. Thank you, Judge. It just popped into my mind. Okay. So the 2002 agreement expressly provides that the security interest being discussed in that agreement is to cover all indebtedness from the debtor to the lenders, whether it exists as of that date or whether it exists in the future, whether it arises out of this agreement or arises from some other agreement. And there's some belts and suspenders language to the effect that even if we don't mention it in this agreement, if it's a debt, it's covered. Okay? Then you go to the 2004 agreement, and there's a recital that opens the agreement, I believe it's recital C, that says the parties want to amend and restate the 2002 agreement to reduce the amount of money that is available. I'm paraphrasing, obviously. To reduce the amount of money that is available to be borrowed. That is the recital that opens the 2004 agreement. It does not say the parties wish to cancel the 2002 agreement, the parties wish to innovate it, the parties wish to release the existing lien. In the 2004 agreement, it says that the security interest covers past indebtedness, present indebtedness, and future indebtedness. This is a seamless, uninterrupted, secured lending agreement. There is never a break in the chain. There is never a moment in time when some other creditor could have lent money to the debtor and gotten a better security position ahead of TFC. There is no new collateral in the 2004 agreement. That's the key fact in TUSA, that the 2004 agreement doesn't give the lender any rights in collateral that it did not already have. There's no new category of collateral. In fact, Your Honors, and I don't recommend this unless you're having trouble sleeping at night, but if you read the 2002 and 2004 agreements next to each other, they are obviously identical. They are obviously from the same... So why doesn't the 2004 replace the 2002 then? If they're identical and isn't their language, and you know this way better than I do at this moment in time, isn't their language in the 2004 saying this replaces any prior agreements? There's a merger clause in the 2004 agreement, as there is in most complex commercial contracts, that says to the extent there have been oral negotiations prior to this time, they're merged into this agreement. And obviously the 2004 agreement changes. It says it's an amendment. Unibank is dropped out. The ceiling on the lending ability is dropped. It is an amendment. The question under Ohio statutory law is, does the lien change? Does the lien evaporate? Is there a break in the chain in the security interest? And Judge Gaunt, I believe, correctly read the two agreements as unambiguous and said, no, there isn't. Maybe you could explain to me, what detriments to any of the parties would there be if what happened was the 2002 agreement and lien expired at the moment that the 2004 agreement and lien starts? Is there any problem for anybody if that's what happened? Other than what's happening in this case, obviously. Well, your Honor is going to have to forgive me. I didn't anticipate that question, so my answer may not be complete. But I would want to think about whether there was a problem for TFC arising out of the fact that we had not filed the 2004 UCC1. In other words, if the 2004 agreement were intended to be an ovation, and the Ohio cases that we cite, the Ohio State cases that we cite say, there has to be a clear expression of intent before the court will not presume an ovation. There has to be a clear expression of intent to do that. If the agreement said that, this is an ovation, right? I would think that it would have been wise for Textron to file a UCC1 in 2004, and we did not because we saw no reason to. Let me also just point out that in the 2002 agreement, there is a provision, as you would expect, that says at some point in time the borrower is not going to owe us any more money anymore, and therefore the lien is going to be gone. And when that happens, we, Textron, will file the appropriate paperwork to tell the world that the UCC1 we filed isn't in effect anymore, is terminated. Just like if you take out a car loan and eventually you pay it off, you get some letter from the bank saying the lien on the car is released. That never happened here. Instead, in 2006, because UCC1s expire after a certain period of time, in 2006 we file a continuation notice saying, hey world, remember that 2002 UCC1 filed? Just letting you know, even though it's 2006, it's still good, it's still in effect, we've still got the same lien. And why doesn't all of this amount to a dispute of fact not appropriate for resolution on a 12b6? Because under Ohio State law, if the language of a contract is unambiguous, well, two things. First, whether or not, sorry. That just restates my question. Why don't we have a sufficient ambiguity here to subject the defense you offer to some discovery? I don't know what that discovery would be, Judge. The question of whether a contract is unambiguous is a question of law for the court. So obviously you have a noble review over what Judge Gawne found, but I obviously have. But we don't really know, do we, on the present record, why there was no filing in 2004? I mean, I understand your argument. Your client didn't think it was necessary. But is there any affirmative showing in the record? Other than that they didn't file one? Well, what we know in the record, Judge, what we know is that under Ohio State law, the party's intent to novate, if that's a word, can never be presumed and must be expressed clearly in a contract. We know that there's no such thing in the 2004 agreement. And there's plenty of language in the 2002 and 2004 agreements that makes clear that it was not a novation. Your argument almost seems to be that the word we intend to this document shall serve as a novation. It's almost like you're saying you have to use the precise words, novation. I think it would be wise. What's not required? Well, what's required under Ohio State law, and I don't have the case name in front of me, Your Honor, but it's in our briefs, is that it can never be presumed and there must be a clear expression of intent. But it can be proved. Obviously, you're right, it can't be presumed. But like any other contract that's ambiguous, and ambiguity is a question of law, a novation can be determined on the basis of extrinsic evidence, just as the intent of the parties can be proved under any other ambiguous writing. Don't you agree with that basic principle? No, I don't. You don't? Not under Ohio State law. I believe it's clear from the case we cite that if... So Judge Gibbons is right. You have to have magic words. I don't mean to speak over you, Judge, I'm sorry. No, I don't think you have to have magic words, Judge. There's plenty of ways for lawyers to say things. The question is whether, in this agreement, is there any language that clearly evidences the trustee's client's intent to no longer permit TFC to have a lien on the assets that it previously had a lien on. I would respectfully suggest the unambiguous language of these agreements says exactly the opposite. Well, you know, it must be that you can offer extrinsic evidence. You yourself have done it. The absence of a UCC-1 in 2004 shows, only goes, doesn't show whether there was a novation or not. It only has some tendency to show what your client thought. Well, Judge, that may be so, Judge. The agreements, however, expressly say what the debtor's intent is. They're in Section 11 and I believe in Section 32 of both the 2002 and 2004 agreements. And, of course, in the recital to the 2004 agreement, the language provides what the debtor's intent is. It's a written admission by the debtor about what they were intending to do in these agreements. My red light is on. Might I just say one brief moment about the statute of limitations because I know Your Honor asked about it. I just wanted to point out a couple of small points. I won't greatly expand upon my time. One, the one-year discovery rule has no application to the conspiracy claim and has no application to the constructive fraudulent conveyance claims. It only, under Ohio law, has application to the intentional fraudulent conveyance claim. Second of all, I would respectfully ask the Court to look at the Ohio Statute 1336.09A, which is the section that has the one-year look back in it. And if I could just read one phrase, it says it's four years after the transfer was made or the obligation was incurred, or if later, if later, because it may not be later, right, within one year after the transfer or obligation was or reasonably could have been discovered by the claimant. The only case in the Sixth Circuit, within the Sixth Circuit that we have found, or within the State of Ohio that we have found that's on point, and the trustee does not cite anything otherwise, is Trinis v. Spitaleri, which is on page 43 of our brief, and we quote from it at some length. The statute means what it says and says what it means. Thank you. Your time is up. Thank you, Judge. Thank you, Your Honor. Your Honors, we believe that the agreement actually is unambiguous with the four provisions that I cited. Paragraph 39 does not merely merge, it supersedes. It uses the word supersedes. Where is the 2004 lien? Is it in the 2004 agreement? There's a provision for a lien? Yes, Your Honor. A lien is a security interest, and the security interest is reflected expressly in paragraph 11A of the 2004 agreement, where it says, and I'm quoting as best I can from memory, a security interest is created hereby. And hereby, I looked it up in the dictionary, it means by virtue of this document. But if there were an ambiguity on this point, Judge Davis, further to your questions, this would require remand for discovery. And the cases that are cited by the parties to this court, including Jamaica Avenue, a decision of this court, and the McLaughlin case from Ohio, both say that if there's an ambiguity, you follow the normal rules of contract construction here. If it's unambiguous. No special rule for novation. And I believe even Textron cited cases to that effect. I think it's unambiguous, but if it's not, then we need to take some discovery. The question here, Your Honors, is not whether there's a seamless loan relationship. It's not whether the collateral remains the same. I'm not even sure it's necessary for us to establish a complete novation. The question here under the UFTA is, which lien is in effect? And the lien that's in effect. The perfected lien or the unperfected lien? Well, and let me address that, Your Honor, because Counsel is absolutely incorrect in his comments about the filing of the UCC statement. The filing of the UCC statement does not, it perfects what is otherwise a valid lien. It doesn't make a lien that's otherwise invalid valid. As this Court held in Bayer Court v. Massotech at 269F3726, it is the executed security agreement, in other words, the loan and security agreement in 2004, that creates the security interest, not the filing of a financing statement. And what's really interesting is that Textron cited to this Court a whole series of cases which held that a financing statement can actually predate the lien and still serve to perfect that lien. Those cases include, among others, In re Adani and In re Oak Rock, both of which are cited by Textron and which directly refute what Counsel just told you. With respect to the civil conspiracy claim, I didn't get a chance to address the statute of limitations issue there. And the statute of limitations has an exception in most jurisdictions for adverse domination. This Court, as we noted in supplemental authority that we provided to you recently in the Antioch case, held that the Ohio Supreme Court would, as an eerie guess, not recognize the adverse domination doctrine. That's an unpublished decision. Judge Moore, you obviously are aware you wrote a dissent in that case. I'm aware, yes. And we believe your dissent was absolutely correct, and we would urge the Court to adopt that reasoning. You are not bound by a panel of the Court that issued an unpublished decision as they did in Antioch. And finally, Your Honors, I would just ask the Court to consider the consequences of what Textron is really saying here. And in addition to the fact that there's a new lien, we also, I mentioned there are three reasons why the decision below was wrong, and we haven't gotten a chance to discuss it today, but we certainly have in our briefs. The trustee is able to avoid a fraudulent obligation as well as a fraudulent transfer. And the obligations that were created by the 04 agreement were fraudulent. We did allege that they were made with the intent to defraud. And there certainly was bad faith on the part of Textron. And we can avoid those. And then, as a matter of Ohio law, once an obligation is avoided, the lien securing those obligations is nullified. And your red light is on again. Thank you. Thank you. Thank you both for your argument. The case will be submitted. Would the Court call the next case, please?